UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-cv-24394-ALTMAN/REID

CITIMARK INTERNATIONAL
LIMITED,

    Plaintiff,

v.

V10 GOLBAL LOGISTICS &
TRADING CORP., *et al.*,

    Defendant.

_____/

# REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS

This cause is before the Court on Defendant, V10 Global Logistics & Trading Corp.'s ("V10") Motion to Dismiss [ECF No. 19], Plaintiff, Citimark International Limited's ("Citimark") First Amended Complaint ("FAC") [ECF No. 12]. For the reasons discussed below, it is **RECOMMENDED** that V10's Motion to Dismiss be **DENIED**.

## RELEVANT PROCEDURAL HISTORY

Citimark filed the FAC on February 2, 2022, asserting six claims against V10 seeking compensatory damages in the amount of $24,257,801 and punitive damages alleging: (1) breach of contract; (2) promissory estoppel; (3) tortious interference with business relationships; (4) violation of Florida's Deceptive and Unfair Trade Practices Act; (5) fraud; and (6) conversion. [ECF No. 12]. V10 filed a Motion to Dismiss the FAC. [ECF No. 19]. V10's Motion seeks dismissal of three of Citimark's claims: breach of contract, tortious interference, and conversion.

1

## BACKGROUND

This is in many ways a typical breach of contract case. Citimark, a Hong Kong Corporation, is a wholesale distributor of frozen chicken and other animal meat products. [ECF No. 12 at ¶ 4]. It has ongoing business relationships with several different frozen meat purchasers, including restaurants, suppliers, and food distributers in China. [*Id.* at ¶ 4, 17]. According to the FAC, beginning in March 2021, Citimark began negotiating with Defendant, V10, a Florida corporation holding itself out as a "global seller and supplier of frozen foods," for the purchase of frozen Brazilian meat products. [*Id.* at ¶¶ 11, 18]. V10 made representations to Citimark that V10 had relationships with Brazilian meat farms, including Copacol, Rivelli, and Cvale, and could sell frozen Brazilian meat products to Citimark for shipment and distribution to Citimark's customers. [*Id.*]. Citimark negotiated with V10 for the purchase, shipment, and distribution of frozen Brazilian meat to Citimark's customers in China. [*Id.*].

More specifically, on or around March 2021, Citimark representatives spoke with Kris Kielbasiewicz. [*Id.* at ¶ 19]. The statements Kielbasiewicz made during these communications, and his relationship to V10 play an important role in this dispute. Kielbasiewicz, purportedly holding himself out as "'the VP of Sales for V10'—offered to sell, supply, and ship Brazilian-sourced frozen chicken and pork products to Citimark in China." [*Id.*]. During the negotiations, Kielbasiewicz and Citimark agreed Citimark would pay a deposit of 30% of the order price upon confirmation, and the remaining 70% balance after Citimark received copies of the shipping documents. [*Id.*].

Kielbasiewicz is also the Director of, as of yet unserved Defendant, IMC Europe Sp. Z o.o. sp.K ("IMC"). [*Id.* at 178]. IMC, whose role in this case is disputed by the parties, is a Polish company also involved in the wholesale distribution of frozen meat products. [*Id.* at 12]. Citimark

contends that during its negotiations with Kielbasiewicz, it was agreed that IMC would serve as V10's authorized agent and broker in this matter, and "would assist in facilitating the financing of V10's sale and shipment of frozen meat products to Citimark." [*Id.* at ¶¶ 19–20].

Citimark accepted Kielbasiewicz's terms and began contacting V10 directly, primarily through its VP of Operations, to order the type of product, brand, and quantity it needed. [ECF No. 12 at ¶¶ 19, 21]. V10 would in turn provide the requested information and, following Citimark's acceptance of the proposed terms, V10 would have IMC issue "Proforma Invoices," memorializing "all essential terms and conditions of [the] purchase offered by V10 and accepted by Citimark." [*Id.* at ¶ 22]. Each of the Proforma Invoices included the type and brand of the products ordered, the quantity, the price per metric ton, the type of shipping container, shipping terms, proposed delivery date, total purchase price, previously accepted payment terms, and wiring instructions to IMC's account. [*Id.* at ¶ 23]. IMC also sent copies of these Proforma Invoices to V10 in Florida. [*Id.*].

As specified by the Proforma Invoices, Citimark paid IMC for the agreed upon meat products. [*Id.* at ¶¶ 23, 24]. IMC wired the money to V10, then V10 issued a "Statement of Payment" from its Florida office to Citimark. [*Id.*]. Citimark contends the Statement of Payments confirmed each payment V10 received from Citimark. [*Id*]. Upon receipt of these payments, V10 agreed to place Citimark's order with the Brazilian meat farms. [*Id.* at ¶ 25]. V10 then emailed copies of proposed shipping documents to Citimark for approval, which included the Brazilian meat farm's order and invoice, bills of lading, shipping details, certificate of export, packing list, and certificate of origin. [*Id.*]. Following Citimark's approval, V10, usually via its operations assistant in Florida, emailed the shipping confirmation documents to Citimark, requiring Citimark to pay the remaining 70% of the purchase price. [*Id.* at ¶¶ 19, 25].

Between March and July of 2021, Citimark placed numerous orders with V10 in this manner for over 1,600 containers of Brazilian frozen meat products. [*Id.* at ¶ 11-23]. In the FAC, Citimark alleges 96% of these orders were never filled, despite having paid V10 over $16,000,000. [*Id.* at ¶¶ 98–101]. Citimark asserts that it continued to place orders with V10 during this period, based on V10's representations that the nonperformance was a result of complications caused by the COVID-19 pandemic and concomitant scarcity of shipping containers which impacted the Brazilian suppliers. *See generally* [*Id.* at ¶¶ 53–61]. Citimark informed V10 that it was relying on the fulfillment of these orders so that it could meets its obligations to existing customers in China, and that "shipping or other delays would frustrate and produce a hardship for Citimark concerning … [its] existing customers in China." [*Id.* at ¶¶ 31–33].

When Citimark learned V10's representations regarding its reasons for nonperformance were false, this became more than a simple breach of contract case. To induce continued orders, Citimark alleges V10 went as far as forging documents. Specifically, Citimark alleges that on June 18, 2021, V10 sent Citimark representatives a copy of a letter, purporting to be from Copacol's International Sales Manager, concerning the orders Citimark had placed with V10. [*Id.* at ¶ 56]. The June 18 letter, written on Copacol letterhead, stated as follows:

> We at Copacol would like to address delays in shipments. There is a worldwide shortage of containers, availability is scarce, and affects shipments. Also, Covid situation in Brazil is severe, resulting in decreased labor force and office working remotely. We are late shipping to all our customers. We expect to improve greatly by the end of July.

[*Id.* at ¶ 57]. Having no reason to doubt the letter's veracity, and because of Citimark's obligations to its customers in China, Citimark relied on the letter, and continued to place orders with V10 through early August 2021. [*Id.* at ¶ 58]. But, those additional orders were never fulfilled. [*Id.* at 17-23]. By August 25, 2021, when the situation had not improved, Citimark contacted Copacol

directly and was informed by Copacol's International Sales Manager that the June 18 letter was a forgery; it was not written by Copacol. [*Id*. at ¶¶ 59-60]. He stated that Copacol's shipments were not affected by the pandemic nor container shortages, and Copacol was operating and shipping under normal schedules. [*Id*.].

Citimark alleges V10's misrepresentations were not limited to the June 18 Letter or explanations regarding the Brazilian suppliers' COVID-19 related shipping issues. Citimark contends V10 had at times indicated that paid-for-shipments had been sent to China, when in reality V10 resold these shipments to other customers without Citimark's consent. [*Id.* at ¶ 41].

On November 18, 2021, Citimark's attorney sent a letter to V10, detailing the breach of contract, and demanding full performance. [*Id.* at ¶ 93]. V10 never responded. [*Id.*]. Between October and December 2021, Citimark contacted V10 and IMC attempting to resolve the dispute, but V10 responded by asking Citimark to place additional orders. [*Id.* at ¶ 95]. During that time, on numerous occasions, Citimark requested V10 provide it with proof of the payments of Citimark's funds to Copacol and the other Brazilian meat suppliers. [*Id.* at ¶ 96]. V10 failed to do so. [*Id.*]. The instant suit followed.

## DISCUSSION

V10 argues that the FAC contains insufficient allegations to support Citimark's breach of contract, tortious interference, and fraud claims. For the reasons addressed below, V10's assertion is incorrect, and the FAC contains well-pleaded allegations as to these three claims sufficient to survive V10's Motion to Dismiss.

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

To achieve this end, pleadings must contain more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). Therefore, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

"A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663 (citing *Twombly*, 550 U.S. at 556). This standard "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-harmed-me accusation." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (internal quotation marks and citation omitted), *abrogated on other grounds by Mohamed v. Palestinian Autho.*, 566 U.S. 449 (2012). Rather, the plausibility "standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). In reviewing a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

**I.       Citimark's FAC Sufficiently Alleges Privity of Contract with V10**

The Undersigned finds, and the parties agree, this diversity case is governed by Florida contract law. To establish the existence of a contract a party must show: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms. *Kolodziej v. Mason*, 774 F.3d 736, 740–41 (11th Cir. 2014) (citation and quotation omitted) (applying Florida law). "A valid contract arises when the parties' assent is manifested through written or spoken words, or inferred in whole or in part from the parties' conduct." *L&H Const. Co., Inc. v. Circle Redmont,*

*Inc.*, 55 So. 3d 630, 634 (Fla. 5th DCA 2011) (internal quotation marks and citations omitted). Florida courts have explained that "the term 'privity' is a word of art derived from the common law of contracts and used to describe the relationship of persons who are parties to a contract." *Espinosa v. Sparber, Shevin, Shapo, Rosen & Heilbronner*, 612 So. 2d 1378, 1379–80 (Fla. 1993); *see also Sumitomo Corp. of Am. v. M/V Saint Venture*, 683 F. Supp. 1361, 1368 (M.D. Fla. 1988) (explaining that "[p]rivity of contract is that connection or relationship which exists between two or more contracting parties; it is essential to the maintenance of an action on any contract that there should subsist privity between the plaintiff and defendant in respect to the matter sued upon").

Under Florida's Uniform Commercial Code, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Fla. Stat. § 672.04(1) (adopting U.C.C. 2-204). Further, in determining the existence of a contract "any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." Fla. Stat. § 672.208(1). Additionally, under Florida law "[t]he terms of a contract for the sale of goods may be encompassed in an invoice or series of invoices." *Assicurazioni Generali S.p.A. v. Facey Commodity Co., Inc.*, No. 10-20736-CIV, 2012 WL 12865254, at *3 (S.D. Fla. Sept. 27, 2012) (citing *Jarmco, Inc. v. Polyguard, Inc.*, 668 So. 2d 300, 304 n. 6 (Fla. 4th DCA 1996)).

Here, V10 argues that Citimark has privity of contract with as of yet unserved co-defendant IMC, *not* V10. Specifically, V10 contends that "[i]n an effort to establish a valid contract, [Citimark] alleges that V10, acting through IMC's Director, made an offer to sell, supply and ship frozen meat products to Citimark." [ECF No. 19 at 4]. Citimark, on the other hand, contends the FAC demonstrates a plausible claim of privity of contract with V10. Citimark points to: (1) its negotiations with Kielbasiewicz in which he stated he was V10's "VP of Sales," and conducting

7

business on V10's behalf; (2) that the terms of the contract were memorialized in the proforma invoices in which IMC was purporting to act as V10's broker; and (3) the parties' performance consistent with the contract terms memorialized in the proforma invoices. *See generally* [ECF No. 24 at 7–9].

Taking Citimark's allegations as true, which this Court must, the facts included in the FAC provide sufficient detail demonstrating privity of contract between Citimark and V10. First, the allegation that Kielbasiewicz was acting in his capacity as V10's VP of Sales in negotiating with Citimark demonstrates that the offer to contract was made by V10, and not by IMC. [ECF No. 12 at ¶ 19]. Second, that the purported terms of the contract, contained in the proforma invoices were issued by IMC on its letterhead, does not preclude a finding of privity. Rather, Citimark avers that this arrangement was an explicit part of the bargain between it and V10, and that the contract specifically contemplated IMC serving as a broker or intermediary in the parties' financial dealings. [*Id.* at ¶¶ 12, 23–24]. Third, Citimark also maintains that it routinely contacted V10 to place new orders and to discuss shipping, quantity, and price terms. [*Id.* at ¶ 22]. Lastly, Citimark alleges a number of V10 employees, including its CEO, sent numerous emails in which V10 referred to the proforma invoices as the contract between the parties and acknowledged that it was responsible for the shipments. [*Id.* at ¶¶ 29–30].

Together these allegations are sufficient to show the existence of a contract between Citimark and V10, at least for purposes of surviving a motion to dismiss. The offer is contained in written correspondence and oral correspondence between Kielbasiewicz and Citimark. The acceptance can be found in the same communications and in Citimark's numerous payments to V10. Citimark's payment as agreed by V10 was consideration for the frozen meat products. And, lastly, the essential terms are found within the proforma invoices.

In its Motion to Dismiss, V10 avers that it was in fact the broker in the transactions, rather than IMC, that Kielbasiewicz was negotiating in his capacity as IMC's Director, and therefore IMC was the sole party with whom Citimark had contracted. *See generally* [ECF No. 19 at 4–6]. To the extent V10 argues Kielbasiewicz lacked the authority to contract on V10's behalf and was in fact negotiating in his capacity as Director of IMC, this is an issue for discovery. The well-pleaded allegations in the FAC, however, paint a plausible picture in which Citimark contracted with V10 to purchase frozen meat products, paid V10 to ship the products, and was deprived of the benefit of the bargain when approximately 96% of the shipments were never received, despite V10 retaining Citimark's payments. This is sufficient to survive the motion to dismiss as to the privity issue.

Additionally, V10 argues, mostly in the context of the breach of contract argument, that the FAC "directly contradicts several allegations in [Citimark's] original complaint simply to avoid dismissal." [ECF No. 19 at 2]. V10 argues these contradictions are impermissible because "[a] plaintiff may not directly contradict the facts set forth in an original complaint in a transparent attempt … to amend his pleading[s] in order to avoid a dispositive defense raised by a defendant[.]" [*Id.*] (quoting *Rubinstein v. Keshet Inter Vivos Tr.*, No. 17-61019-CIV, 2018 WL 8899230, at *5 (S.D. Fla. Oct. 17, 2018), *report and recommendation adopted*, No. 17-61019-CIV, 2018 WL 8899004 (S.D. Fla. Nov. 15, 2018)). The only contradiction V10 points to, however, is that the original Complaint represented that Kielbasiewicz was IMC's Director, whereas in the FAC, Citimark "removed the allegation indicating Mr. Kielbasiewicz's role as IMC director, and instead suggested that Mr. Kielbasiewicz was acting solely as V10's VP of Sales and broker." [ECF No. 19 at 2].

9

The contradictions addressed in *Rubinstein* arose in a very different context. There, the plaintiffs took issue with the court having taken judicial notice of publicly available records which contradicted the amended complaint, while at the same time the plaintiffs attached selected portions of those records which supported their allegations. *Rubinstein*, 2018 WL 8899230, at *5. Further, the plaintiffs omitted numerous exhibits which had been attached to the prior complaint, but which undermined the allegations in the amended complaint. *Id.* Thus, *Rubinstein* is inapplicable because the facts of that case are starkly different than those here.

Here, V10's argument fails for a very simple reason: the allegations it points to are not contradictory. In the original Complaint Citimark provided that "[i]n written correspondence on March 15, 2021, Citimark's Steven Chen and IMC's Director Kris Kielbasiewicz (*who was and acted as, the "VP of Sales for V10"*), agreed upon the payment terms applicable to Citimark's proposed orders of Frozen Brazilian chicken and other meat products from and through IMC and V10." [ECF No. 1 at ¶ 19] (emphasis added). The FAC, on the other hand, provides that "V10—acting through Kris Kielbasiewicz, who represented to Citimark that he was the 'VP of Sales for V10'—offered to sell, supply, and ship Brazilian-sourced frozen chicken and pork products to Citimark in China." [ECF No. 12 at ¶ 19]. In both assertions, Kielbasiewicz is said to be working in his capacity as V10's VP of Sales when negotiating with Citimark. In fact, the FAC does acknowledge Kielbasiewicz's dual role as IMC's Director and V10's VP of Sales. *See* [*Id.* at ¶ 178]. As such, V10's contradiction-argument is unpersuasive.

II. **The FAC Contains Sufficient Facts to Establish a Plausible Claim of Tortious Interference**

"Under Florida law '[t]he elements of tortious interference with a business relationship are (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant;

10

and (4) damage to the plaintiff as a result of the breach of the relationship.'" *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1279 (11th Cir. 2015) (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)). The only element under debate here is whether Citimark sufficiently alleged that V10 intentionally and unjustifiably interfered with Citimark's business relationships with its existing Chinese customers. V10's briefing of the tortious interference claim, which is sparse all together, focuses entirely on the third prong.

"As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc*, 647 So. 2d at 815. Thus, a plaintiff must establish the existence of a business relationship with identifiable customers. *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*, 687 So. 2d 821, 822 (Fla. 1996).

Intentional and unjustified interference with a business relationship, requires the plaintiff to allege "the defendant acted without justification." *Duty Free Ams.*, 797 F.3d at 1280 (quoting *Sec. Title Guar. Corp. of Balt. V. McDill Columbus Corp.*, 543 So. 2d 852, 855 (Fla. 2d DCA 1989)). Florida law recognizes an exception, or a privilege to interfere, where the interference is done to safeguard or protect the defendant's own business interests. *Gunder's Autho Ctr. v. State Farm Mut. Auto Ins. Co.*, 422 F. App'x 819, 822 (11th Cir. 2011) (citation omitted). This competition privilege does not apply to instances where the interference was done solely for malicious purposes or where improper methods were used. *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004). Improper methods include "the purposeful causing of a breach of contract." *Id.* (quoting *McCurdy v. Collis*, 508 So. 2d 380, 384 (Fla. 1st DCA 1987)).

V10, relying on a case applying Alabama law, contends that, Citimark's allegations focus "solely on the alleged breach of contract here … [and] [i]n so alleging, Plaintiff completely disregards the most critical element of any *intentional* tort—intent." [*Id.* at 7]. V10 provides little more, however, and appears to ignore significant portions of the FAC. Citimark alleged in support of the tortious interference claim that: (1) it had informed V10 of its numerous existing relationships with Chinese customers; (2) it specifically identified several of these relationships; (3) it indicated to V10 that shipping delays would frustrate and harm its relationships with these customers; and (4) V10 forged the June 18 letter in which it represented that product shipments had been delayed, rather than rerouted or simply never ordered. *See generally* [ECF No. 24 at 12].

These well-pleaded facts indicate that V10 understood the impact its failure to ship the products to Citimark would have on its existing business relationships and disregarded that impact. Further, the FAC alleges that V10 tricked Citimark with a forged letter to induce Citimark to continue to rely on it—knowing this continued reliance would further harm Citimark's business relationships. Taken together, this forms a sufficient factual basis to demonstrate the necessary intent to harm Citimark's relationships with its customers and states a plausible claim for tortious interference.

Additionally, while neither party addresses the competition privilege, the FAC does contain facts supporting an inference that, through its misrepresentations and fraudulent conduct, V10 employed improper methods. The alleged facts in the FAC are adequate to demonstrate V10's improper conduct abrogated any privilege to interfere with Citimark's business relationships. Consequently, the FAC provides an ample factual basis to survive dismissal at this juncture.

### III. The FAC Contains Sufficient Facts to Establish a Plausible Claim of Conversion

"Under Florida law, the tort of conversion is an unauthorized act that deprives another of his property permanently or for an indefinite time." *Neelu Aviation, LLC v. Boca Aircraft Maint., LLC*, No. 18-CV-81445, 2019 WL 3532024, at *7 (S.D. Fla. Aug. 2, 2019) (citing *National Union Fire Ins. Co. v. Carib Aviation, Inc.*, 759 F.2d 873, 878 (11th Cir. 1985)). "Accordingly, 'in order to state a claim for conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property.'" *BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1349 (S.D. Fla. 2021) (quoting *Indus. Park Dev. Corp. Am. Exp. Bank, FSB*, 9600 F. Supp. 2d 1363, 1366 (M.D. Fla. 2013)).

Under Florida law "a simple monetary debt generally cannot form the basis of claim for conversion." *Walker v. Figarola*, 59 So. 3d 188, 190 (Fla. 3d DCA 2011); *see also Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008) (noting that "[i]t is well-established law in Florida that a simple debt which can be discharged by the payment of money cannot generally form the basis of a claim for conversion or civil theft"). There must be conduct that goes beyond the mere failure to comply with the terms of contract. *See Gasparini*, 972 So. 2d at 1055–56 ("This is not to say there can never a claim for civil theft or conversion if there is a contractual relationship between the parties, but rather that the civil theft or conversion must go beyond, and be independent from, a failure to comply with the terms of a contract").

In addition, "[m]oney may be the subject of a conversion [claim] only where it 'consists of specific money capable of identification.'" *Kee v. National Reserve Life Ins. Co.*, 918 F.2d 1538, 1541 (11th Cir. 1990) (quoting *Belford Trucking Co. v. Zagar*, 243 So. 2d 646, 648 (Fla. 4th DCA 1970)). "Money is capable of identification where it is delivered at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the

deposit, or where the wrongful possession of such property is obtained." *Belford*, 243 So. 2d at 648.

The fund of money must "*actually exist to pay a specific debt owed*" in order to establish that the plaintiff "is not merely transforming a contract dispute into a conversion claim." *Tambourine Comercio Int'l SA v. Solowsky*, 312 F. App'x 263, 272 (11th Cir. 2009) (emphasis in original) (citing *Allen v. Gordon*, 429 So. 2d 369, 371 (Fla. 1st DCA 1983)). Thus, a claim for conversion constitutes "'an affirmative and intentional act of converting the funds to [the defendant's] own use by allegedly stealing the monies to which [the defendant] was entrusted.'" *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1362 (M.D. Fla. 2007) (quoting *Pershing Indus., Inc. v. Estate of Sanz*, 740 So. 2d 1246, 1248 (Fla. 3d DCA 1999)).

Citimark alleges two separate bases for conversion. The first arises from V10's alleged resale of "more than $2,045,946 worth of Citimark's frozen meat products to other customers, despite receiving Citimark's full payment for those orders." [ECF No. 12 at ¶ 182]. The second involves V10's refusal to refund "the specific and identifiable sums that Citimark paid to V10" for deposit in the Copacol account and for the undelivered and resold orders. [*Id.* at ¶¶ 182, 183]. V10 counters as to the first basis by arguing that since it never had possession of the frozen meat products, it could not assert dominion over them to Citimark's detriment. [ECF No. 19 at 7–8]. Further, it argues that it had no ability to resell the products to other customers, rather, the supplier, Copacol, refused to release the products when it never received payment from V10. [*Id.*]. As to V10's purported retention of the money paid for unfulfilled or resold orders, it argues that Citimark is impermissibly attempting to turn a breach of contract dispute into a conversion claim in contradiction of Florida law. [*Id.* at 8–9]. Thus, V10 argues Citimark's conversion claim is not independent from the contractual issues in this case because the "alleged contract was for the

14

purchase of the frozen meat products, and any amount that would result from an alleged failure to deliver the frozen meat products would result in a breach of contract." [*Id.* at 9].

Both of V10's arguments fail. Regarding the alleged resale of the frozen meat products, Citimark alleges that V10, having received payment, informed Citimark that the products had been shipped to China, when in fact it had resold numerous containers to other customers. [ECF No. 12 at ¶¶ 42–43, 90, 100, 182–83]. That V10 did not have physical possession of these shipments does not prevent it from exercising dominion over them. In the FAC, Citimark contends that V10 had the ability to, and did, resell these shipments to other customers—despite Citimark having already paid for them. Further, Citimark avers that V10 represented the shipments were on their way to China. Taken as true, V10's dominion or control of the product deprived Citimark of its ownership interests in the property it had bought and believed had been shipped. As Citimark notes in its Response to V10's Motion to Dismiss "[t]he essence of an action for conversion is not the acquisition of the property … but the wrongful deprivation of a person of property to the possession of which he is entitled." [ECF No. 24 at 13] (quoting *Taubenfeld v. Lasko*, 324 So. 3d 529, 542 (Fla. 4th DCA 2021)). The facts alleged in the FAC adequately demonstrate that V10 wrongfully deprived Citimark of numerous shipments. This is sufficient to state a plausible claim of conversion.

V10's argument regarding its alleged retention of Citimark's various payments for orders that were never filled similarly fails. The FAC is replete with allegations that V10 made fraudulent representations to receive Citimark's business, retain that business, and induce continued purchases from Citimark. In the FAC, Citimark contends this was "a deliberate and orchestrated scheme of international trade fraud … [in which V10] generat[ed] false documents to attempt to excuse their deliberate non-performance." [ECF No. 12 at ¶ 5]. Therefore, the FAC includes

15

sufficient allegations to show the retention of the monies is not constrained to the realms of a breach of contract claim, but constitutes an independent act in which V10 in essence misappropriated the money for its own purposes. Additionally, Citimark argues the funds involved are specific and identifiable because V10 had a duty "to handle *specific and identifiable* sums of Citimark's money in a manner directed by Citimark—that is, to *deliver* Citimark's funds to Copacol, Cvale, and Rivelli (the Brazilian meat plants) pursuant to Citimark's orders." [ECF No. 24 at 13–14]. Consequently, the ability to identify the money sent to V10 does not constitute a hurdle at this juncture.

## **CONCLUSION**

For the foregoing reasons, it is **RECOMMENDED** that Defendant, V10's Motion to Dismiss [ECF No. 19] be **DENIED**.

Objections to this Report may be filed with the district judge within **TEN** (10) days of receipt of a copy of the Report. The Court has decided to shorten the usual fourteen-day objection period due to the pending discovery deadlines in this case.[1] Failure to timely file objections will bar a *de novo* determination by the district judge of anything in this Report and shall constitute a waiver of a party's "right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C).

**SIGNED** this 9th day of August, 2022.

---

[1] Rule 4(b) of the Magistrate Judge Rules, Local Rules for the Southern District of Florida, requires that a party file any objections to a magistrate judge's report and recommendation within fourteen (14) days of being served "or within such other time as may be allowed by the Magistrate Judge or District Judge." S.D. Fla. L. R. (Magistrate Judge Rule 4(b)). Where exigencies exist, a court may shorten the time for filing objections. *See United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978) (holding that the trial court did not err in providing parties less than the [then-applicable] full ten-day period to file objections to the magistrate judge's report and recommendation where exigencies existed, stating that the [then-applicable] "[t]en days is a maximum, not a minimum").

LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc: **United States District Judge Roy K. Altman;**

**All Counsel of Record**